Baldwin, J.
delivered the opinion of the Court.
The bond with collateral condition executed by Dr. Cabell to Davis may be treated as a covenant, and its purpose seems mainly to have been to provide a security which, in the event that has happened of Cabell’s death, would subject his real as well as personal assets. The covenant was of comparatively little value in the lifetime of Cabell, inasmuch as legal proceedings against his person and property could not be materially affected by the dignity of the demand, and would be substantially the same whether it were evidenced by specialty or by simple contract. But the security afforded by a specialty binding his heirs might become all important upon the occurrence of his death. It appears that Davis had incurred responsibilities to a large amount as his endorser in bank, and that renewals of the notes, and other future liabilities of the like kind, were contemplated. The death of Cabell without having discharged these debts, would, without a specialty binding his heirs, leave Davis exposed to the hazard of loss by the inadequacy of the decedent’s personal estate, though the owner of real property of great value.
The condition of the obligation is as follows: “ Whereas the above named Henry Davis hath endorsed sundry notes which have been discounted for the accommodation of the said John J. Cabell, at the office of discount and deposit of the Bank of Virginia in Lynchburg, and it is in contemplation to renew said notes, from time to time, according to the custom of said bank ; now therefore in case the said John J. Ca-bell shall, whenever thereto required by said bank, or *526 by said Henry Davis, or his legal representative, Avell and truly pay and discharge all such notes as iioav are or hereafter may be endorsed for his accommodation by said Henry Davis, Avhether the said endorsement be made ^01' renewal °f the notes already endorsed, or for obtaining from said office of discount and deposit, or elseAvhere, further loans for the accommodation of the said John J. Cabell, on either notes, bills or otherwise, so as fully to indemnify and save harmless the said Henry Davis and his legal representatives, from all loss or damage on account of the said endorsements, then the above obligation to be void, else to remain in full force and virtue.”
This was not a covenant of mere indemnity, but a covenant to pay the notes &c. whenever required by the bank or by Davis. It was not in the alternative either to pay the notes, or to indemnify and save harmless, but a direct and positive engagement to pay, and by that means indemnify and save harmless : and thus in effect it was a stipulation that by payment of the debts Davis should be relieved from all responsibility as surety therefor. Nor Avas any formal demand or notice from the bank or from Davis necessary to give effect to the covenant. It is not pretended that the bank was bound by any contract with Cabell to extend to him credit beyond the period stipulated in the notes, nor that Davis was so bound to continue his endorser. By the uniform usage and custom of banks, and the universal understanding of those Avho deal with them, notes negotiable and payable there must be paid at maturity, or within the three days of grace thereafter. And the failure to obtain such extension of credit, or the disapproval of the person offered as endorser, would be the most decisive requisition of payment that could be made by the bank. And so the withholding by Davis of a renewed endorsement would be equally a requisition on his part that the notes should be paid by Cabell.
*527 It is clear therefore that the covenant would have been broken by the failure of Cabell in his lifetime to pay the notes at maturity, and that Davis could in that event have maintained an action at law against him upon his obligation. The only difficulty, if any, in such an action would have been in regard to the extent of the recovery. It being incompetent for the legal forum to enforce a specific execution of the contract, a question might have arisen as to the quantum of damages, if the notes had not been paid by Davis, or had been paid by Cabell, before verdict. That is a subject which we need not consider, there having been no breach of the covenant in the lifetime of Cabell (the notes not having reached maturity until after his death,) and it serving to throw no light upon the present suit in equity.
The covenant of Cabell to pay the notes not only devolved at his death upon his personal representative, but also descended upon his heirs at law, and the latter became as much bound to pay them out of the real assets as the former to pay them out of the personal assets. And the death of Cabell, and the arrival of the notes at maturity without payment thereof out of his estate, constituted by inevitable necessity a breach of the covenant, as well on the part of his heirs as on the part of his administrator. It will be seen from the condition of the bond that it was not in the contemplation of the parties to renew the notes after the death of Cabell; there was no authority on the part of his administrator or his heirs to renew them in their representative character; and in point of fact they were not renewed. On the contrary they were taken up at maturity by Davis the endorser, which he could not have failed to do but at the expense of his credit and the harassment of a suit.
It appears that by an arrangement with the banks Davis obtained the means of relieving himself from his *528 liabilities to them as Cabell’s endorser. This was accomplished by his giving his own notes with a nominal endorser, and pledging as collateral securities the notes °f Cabell and his obligation aforesaid. Davis’s notes werR discounted by the banks, and the proceeds applied to the credit of Cabell’s notes, and the banks consented to indulge Davis upon his notes so discounted until the collateral securities were exhausted. This transaction was perfectly fair and legitimate, and conformable to the rule of equity by which a creditor is entitled to avail himself of any counter bonds or other securities given by the principal debtor to those bound with him as sureties ; and the principle is not varied by his consenting to take the surety as his principal debtor, with a transfer of such securities so previously acquired. We need not consider whether this adjustment was equivalent to a payment to the banks of Cabell’s notes by Davis the endorser; for the result as it affects the merits of this suit is the same either way. The full amount of the notes was afterwards paid by Cabell’s administrator out of the personal assets of the estate, and whether in reimbursement of Davis, or in satisfaction of the banks, who stood in his place and held his securities is wholly immaterial.
The merits of the case, however, do not depend upon the enquiry, when or by whom the notes of Cabell have been actually paid, or whether they have been paid at all; but upon the force and obligation of the covenant and the condition of the assets. The counter bond of Cabell by which he bound himself and his heirs to pay off his notes in bank, to the exoneration of Davis his endorser, placed the latter in the position of a specialty creditor, entitled to performance of the obligation from the heirs as well as the administrator. He had two funds for the satisfaction of his demand, the real assets in the hands of the heirs, and the personal assets in the hands of the administrator: the simple *529 contract creditors had but one, the personal assets only. The well established and familiar rules of equity, derived from considerations of natural justice, required a resort by the specialty creditor, to that fund to which the simple contract creditors could not look, or if he should exhaust the personal assets, in the whole or in part, that they should be placed in his stead, and relieved out of the real assets to the same extent. And in a suit for marshalling the assets, it matters not whether the debts binding the heirs have been actually paid or remain to be satisfied, or whether they are evidenced by direct obligations or collateral covenants, or whether the former have not yet fallen due, or the latter have not yet been broken. These are all matters of detail in the arrangement, application and distribution of the assets by the equitable forum, and do not in any wise impair the principles belonging to the subject.
The right of the plaintiffs as simple contract creditors to marshal the assets, and obtain satisfaction of their demands out of the realty in the hands of the heirs in relation to the covenant with Putney, stands upon the same footing and is governed by the same principles as in regard to the covenant with Davis. The contract between Cabell and Putney is in the following words: “Memorandum of agreement between R. E. Putney and John J. Cabell, all of the county of Kanawha, Yirginia: That whereas the said John J. Cabell is endorser for the said Putney in a large sum at the Bank of Yirginia, and being desirous to secure said Cabell as endorser, hereby binds himself, his heirs, &c., to pay to the said Cabell the sum of 10,000 dollars, or so much as the said Putney may be in default to the said bank : and whereas the said Putney is endorser for the said John J. Cabell in a like large sum at the Bank of Virginia at Charleston, Kanawha, and the said Ca-bell being desirous of securing said Putney in the aforesaid undertaking as endorser, hereby binds himself, his *530 heirs, &c., in the sum of ten thonsand dollars, or so much as the said Cabell may be in default to the said bank, to be paid to the said Putney whenever such default shall happen.”
The covenant on the part of Cabell with Putney varies from his covenant with Davis only in point of form, except that the former stipulates in the event of Cabell’s default with the bank, to make payment there- . upon to Putney; and the effect of the two covenants respectively in regard to the real assets of the covenantors, and the consequent equities of the simple contract creditors, is essentially the same. The only difficulty in relation to the covenant with Putney is from the absence of direct evidence to prove that Cabell’s note for 5000 dollars, subsequently made, endorsed and discounted, falls within its provision. The presumption, however, is that said note was not made for a new consideration originating after the covenant, but for the renewal of a note of that amount made by Cabell, with Putney as endorser, and discounted at the bank prior to the covenant. It is a matter, however, which can in all probability be reduced to a certainty one way or the other upon a reference to a commissioner, and such an enquiry ought to have been directed by the Court below.
In proceeding to give relief to the plaintiffs as simple contract creditors entitled to marshal the assets, the Court below had competent authority to decree, at the proper time, a sale of the real estate in the hands of the heirs, so far as requisite for that purpose: But it was premature to do so before adjudicating their several demands, and so ascertaining the amount of indebtedness chargeable upon the lands of the decedent. It is true that the sale which the Court directed of land in Kanawha was upon the petition of the adult heirs and by consent of the plaintiffs; but no such consent could be given on the part of the infant heirs, and their rights *531 and interests were under the protection of the Court. A sale however was had under the decree, which was reported to aud confirmed by the Court, and an order made for the collection of the proceeds; and although it was competent for the Court, these proceedings being interlocutory, to set them aside in the further progress of the cause, upon its appearing that they were prejudicial to the interests of the infants, yet, on the other hand, if appearing to be beneficial to them, there could be no good reason for disturbing them in behalf of any other party. But a bill was filed in the same Court by the purchasers at the sale, praying an injunction (which was granted) to judgments recovered on the bonds given by them for the purchase money, and seeking to set aside the decree for sale, and the proceedings under it, on the ground that the same being irregular and unwarranted as against the infant heirs, and subject to future impeachment by them, they the purchasers were exposed to the hazard of great loss, if compelled to pay up the purchase money.
To this bill of the purchasers the numerous creditors, the heirs of Cabell as well adults as infants, and other persons, were made defendants. Some of the defendants answered, and evidence was taken pro and con upon the question, whether the land was sold at a price prejudicial or advantageous to the heirs, and that case is still pending and undetermined. The proceeding was, however, irregular and improper as a separate suit, and the bill ought to have been treated by the Court as a mere adjunct of the original cause, and in the nature of a petition, and to have been brought to hearing therewith. And if so treated, it would have presented to the consideration of the Court the enquiry whether the sale made under its decree was advantageous or injurious to the infant heirs.
Instead of taking this course, the original suit was again brought to a separate hearing, and the Court *532 without adjudicating any of the demands of the creditors> or making any disposition of the proceeds of sale of the Kanawha land, but leaving the injunction which had been granted to the purchasers in full force, and the ^an<^ ^self in their possession, and the objections which had been made to the sale thereof unadjudicated, rendered another interlocutory decree, by which the whole rents and profits of all the other real estate of the decedent were sequestered.
And the Court is of opinion that there is no error in so much of the decree of the Circuit court as declares the principles upon which the assets real and personal of the intestate ought to be marshalled, but that it is erroneous in not directing the injunction bill of the purchasers of the Kanawha land and the proceedings thereupon to be heard together with and as a part of the proceedings of this suit, and in not adjudicating the question whether the sale of the Kanawha land ought to be established or set aside, and in not adjudicating and marshalling the respective claims of the creditors, and in all other respects wherein it conflicts with the principles above declared. It is therefore adjudged, ordered and decreed, that so much of the decree of the Circuit court as is above declared to be erroneous be reversed and annulled, and that the residue thereof be affirmed with costs to the appellants. And the cause is remanded to the Circuit court to be proceeded in conformably to the principles of this opinion and decree, and upon such further proofs as may be adduced by the parties.